**UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:10 CR 259 JCH/DDN |
| ) | |
| JOHN D. FARNELL, ) | |
| ) | |
| Defendant. ) | |

**ORDER AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). An evidentiary hearing was held on October 18, 2011.

Pending before the court are the motions of defendant John D. Farnell to disclose favorable, impeaching, and/or exculpatory information (Doc. 70), to produce internal memoranda and rough notes (Doc. 71), and to suppress evidence (Doc. 73) and statements (Doc. 74).

**I.   MOTION TO DISCLOSE FAVORABLE INFORMATION**

Defendant Farnell has moved for the disclosure of favorable, exculpatory, and impeaching evidence (Doc. 70), citing Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972). At the hearing on this motion counsel for the government stated that he would provide this information to the defendant without a court order. Therefore, by consensus of the parties and the court, the motion is denied as moot.

**II.   MOTION TO PRODUCE MEMORANDA AND NOTES**

Defendant Farnell has moved for an order that the government produce investigatory memoranda of interviews with witnesses and agents' rough notes of interviews. (Doc. 71.) See Fed. R. Crim. P. 26.2. In response, counsel for the government stated that the rough notes of the investigating Federal Bureau of Investigation special agents of their

interview with defendant will be produced to defense counsel. Therefore, this motion is denied as moot.

### III.  MOTION TO SUPPRESS STATEMENTS

Defendant Farnell has moved to suppress his statements (Doc. 74). At the hearing, counsel for defendant Farnell stated that the defendant withdrew this motion and that it was no longer before the court. Therefore, this motion should be denied as moot.

### IV.  MOTION TO SUPPRESS PHYSICAL EVIDENCE

Defendant Farnell has moved to suppress the physical evidence acquired by the government in its investigation (Doc. 73). From the evidence adduced on this motion at the evidentiary hearing, the court makes the following findings of fact and conclusions of law:

**FACTS**

1. On February 26, 2010, the Missouri State Highway Patrol issued two Missouri Information Analysis Center (MIAC) bulletins relaying information about the investigation of a serial bank robber conducted by the Rolla, Sedalia, Moberly, and Chillicothe police departments. One bulletin was entitled "MIAC ALERT" and requested assistance locating a white minivan that was believed to be involved in the robberies. This alert bulletin included two photographs of the van that were obtained from surveillance cameras and listed several identifying characteristics of the vehicle. One photograph showed the front and driver side of the van and the other showed the front and passenger side. The photographs revealed that the van was distinguished by having only one rear seat sliding door, which was located on the passenger's side of the van.[1] (Doc. 80-1; Gov. Ex. A-1.) The second bulletin, which was entitled "Public Awareness Bulletin," stated "SERIAL BANK ROBBER IS ARMED AND DANGEROUS." It included one photograph of the white minivan and three photographs of the suspected robber taken from surveillance cameras at

---

[1] Most other styles of van vehicles were known to have such sliding doors on both sides of the vehicles.

the robbed banks. In two photographs, the suspect was wearing a dark shirt, dark jacket, dark pants, dark baseball cap, and sunglasses. In the third photograph, the suspect was wearing a light button-down shirt, dark baseball cap, and sunglasses. The bulletin described the robber as a white male, 40 to 50 years old, heavy-set, weighing approximately 300 pounds, standing between 5 feet 7 inches and 6 feet tall, and having "salt and pepper" facial hair. All three of these photographs of the robber displayed a man wearing a dark mustache. (Doc. 80-2; Gov. Ex. A-2.)

2. On April 29, 2010, at approximately 10:30 a.m., Corporal Kyle Wilmont, Missouri State Highway Patrol, Troop I, was on routine patrol in Salem, Missouri when he received a radio dispatcher communication stating that a bank robbery had taken place earlier that morning at the First National Community Bank in Cuba, Missouri. The dispatcher described the suspect as a heavy-set white male wearing a baseball-style cap, dark sunglasses, and a blue long-sleeve button-up shirt. The suspect's vehicle was described as a white van. The dispatcher directed Cpl. Wilmont to assist in establishing a perimeter around the general area of the bank to prevent the escape of any potential suspects.

3. Cpl. Wilmont responded to the call immediately and between 11:00 and 11:15 a.m., arrived at the intersection of Highway 68 and Highway 8, which is located southeast of St. James, Missouri, along a known vehicle travel route between Cuba, Steelville, St. James, and the interstate highway. Cpl. Wilmont positioned himself facing north, where Highways 8 and 68 form a T.

3. Cpl. Wilmont was familiar with the MIAC bulletins issued by the Missouri State Highway Patrol on February 26, 2010 and their earlier descriptions of the suspected bank robber and van. He learned additional information from local news reports: the suspect was a heavy-set white male wearing dark clothing, dark sunglasses, having a mustache, and who was believed to be armed with a pistol. The reports also described the suspect as driving a white minivan with three doors: one front driver's side door, one front passenger side front door, and one sliding back door on the passenger side.

5. At approximately 11:30 a.m., Cpl. Wilmont saw a white minivan traveling westbound on Highway 8 toward St. James. The driver was a heavy-set white male wearing a yellow t-shirt and a yellow baseball cap. As the van passed Cpl. Wilmont's patrol vehicle, the driver held up his left hand to conceal his face. Cpl. Wilmont also observed that the van was similar to the earlier surveillance photographs, because it did not have a sliding door on the driver's side.

6. Believing the driver and the van he now saw matched the descriptions of the robbery suspect and the vehicle he had seen on the MIAC bulletin, Cpl. Wilmont drove up behind the van. He radioed in its license plate number to the Highway Patrol; in response, he was told that the vehicle was registered to John Farnell.

7. Cpl. Wilmont then decided to conduct an investigative stop and so notified the Troop I dispatcher. He turned on his patrol vehicle's lights and siren. Through the rear window of the van, Cpl. Wilmont saw that the driver appeared to be reaching toward the center console area. This movement caused the van to drift to the right toward the shoulder of the road; the driver then steered the van back into the lane. Quickly thereafter, the van was driven into the driveway of a Missouri Highway Department building, just south of St. James, and stopped.

8. Cpl. Wilmont stopped right behind the van and exited his patrol car. He took out his duty weapon and held it out of sight behind his right thigh. Cpl. Wilmont directed the driver to show his hands and place them outside the van window. The driver complied. Cpl. Wilmont saw that the driver's hands were visibly shaking and he seemed extremely nervous. Cpl. Wilmont then asked for his driver's license.[2] The driver provided a license identifying him as John Farnell. Wilmont radioed the license information to the dispatcher. He then asked Farnell step out of the vehicle. Farnell briefly hesitated, said he had to get something, and reached for the center console. Wilmont immediately ordered him to stop and to exit the vehicle. Farnell did so. The officer took Farnell to the rear of the van, which was in front of the patrol car.

---

[2]During this initial contact with the driver, Cpl. Wilmont looked into the van's cargo area. He saw that the bench seats had been removed and that cardboard boxes were where the seats would have been.

9. Cpl. Wilmont then explained to Farnell that he stopped him because the van matched the description of a minivan that was possibly used in a bank robbery in Cuba. Wilmont then described the details of the robbery. Farnell stated he was at that location because he was driving from Steelville after shopping for antiques. Cpl. Wilmont recalled that, when he looked through the van's windows into the cargo area during his initial contact with Farnell, he saw only cardboard boxes, nothing that looked like antiques.

10. The two men then walked to the van's passenger side. There Farnell voluntarily opened the sliding door and sat down on the edge of the floor. From outside the van, Cpl. Wilmont looked through the front passenger side window and saw on the front seat, in plain view, maps with cities that had been highlighted and circled. Cpl. Wilmont asked Farnell if he could look at the maps and Farnell said that he could do so. Cpl. Wilmont made no promises or threats to Farnell to induce his cooperation and Farnell did not appear to be intoxicated or under the influence of any narcotic drug. Cpl. Wilmont then examined the maps and saw that in addition to the highlighted cities, the maps contained hand-written directions. When Cpl. Wilmont asked Farnell about the documents, Farnell said they were locations where he planned to look for antiques.

11. Cpl. Wilmont then told Farnell that FBI agents were on their way to the scene and that they would decide whether or not to eliminate Farnell as a suspect in the bank robbery. Cpl. Wilmont stated that he also wanted to investigate further to determine whether to eliminate him as a suspect. At this time, Cpl. Wilmont radioed the dispatcher for a further description of the bank robber. The dispatcher said the witnesses at the scene said the robber had a chipped right front tooth. Farnell heard this radio dispatch, smiled, and in this way displayed that he had a left front tooth missing. Wilmont told Farnell he was looking for a blue button-down shirt, a ball cap, a large amount of money, and a weapon, and then asked Farnell for consent to search the white van and its contents. Farnell orally consented to the search. Cpl. Wilmont made no threats or promises to get Farnell to consent to the search and Farnell did not appear to be under the influence of any drugs or alcohol at the time he consented.

12.  During this time, Cpl. Wilmont learned via radio that the Missouri Highway Patrol had compared Farnell's drivers license photo to the surveillance photos of the robbery suspect and believed Farnell was the robber.

13.  Before entering the vehicle, Cpl. Wilmont asked Farnell if any of the items he had described were in the van.  Farnell said there was a gun in the van's center console.  Cpl. Wilmont then entered the van, looked in the center console, and located a Ruger Red Hawk .357 revolver.  Cpl. Wilmont removed the firearm from the van and rendered it safe.  The officer took the gun from the van and put it in his patrol car.  There were bullets in five of the six chambers.  He placed the bullets on the van's front seat.

14.  By this time, Highway Patrol Lieutenant James Remillard had arrived.  He directed Cpl. Wilmont to photograph both the gun and the exterior of the van.  Wilmont stopped searching the interior of the van and took the photographs.

15.  Lt. Remillard also directed Trooper Amy McMahon to place Farnell in handcuffs.  She did so and then placed Farnell in the truck of a Missouri Conservation agent who had arrived on the scene.

16.  After he finished photographing the gun and the van, as directed by Lt. Remillard, Cpl. Wilmont reentered the van to search it.  He did not ask Farnell whether he consented to this, and Farnell made no statement about consenting or objecting to a further search of the van.  In the passenger side cargo area, Cpl. Wilmont located a closed green nylon duffle-type bag.[3]  Cpl. Wilmont opened the bag and found a large amount of U.S. currency, a blue button-down shirt, and other items that had been reported as related to the robber.  After the money was found, Lt. Remillard directed Cpl. Wilmont to exit the van and secure it for the FBI.  Cpl. Wilmont stopped his search at that time.

17.  At 11:54 a.m., following the search of the vehicle, Farnell was formally placed under arrest and transported to Troop I Headquarters.

---

[3]Cpl. Wilmont could not see what was inside the bag before he opened it.

18. Cpl. Wilmont stayed with the van until a tow truck arrived. The truck transported the van to Troop I Headquarters. Cpl. Wilmont followed the tow truck back to Troop I Headquarters. He kept the van in sight until a search warrant was obtained and executed several hours later.

19. Also on April 29, 2010, at Troop I headquarters, Farnell signed a "Miranda Warning" form, placing his initials next to each of the five rights stated on the form. He signed the form at 12:42 p.m. (Doc. 80-3 at 1; Gov. Ex. B.) At 1:50 p.m. the same day, Farnell signed a written "Consent to Search and Seize" form, expressly consenting to a search his white 1996 Dodge Grand Caravan. (Doc. 80-3 at 2; Gov. Ex. C.)

20. Later on April 29, 2010, FBI Special Agent Michael Christian applied to United States Magistrate Judge Terry I. Adelman for a search warrant to search Farnell's van. The application was supported by the sworn, written affidavit of Agent Christian. The affidavit described the investigation at hand, beginning with information about the April 29, 2010 bank robbery. It stated that at approximately 10:35 a.m. that morning, a heavy-set white male wearing a dark baseball hat, a blue long sleeved button-down shirt, blue jeans, and sunglasses robbed First Community National Bank of Crawford County in Cuba, Missouri. The robber displayed a handgun, pointed it at the teller, and demanded money. The teller gave the robber $4,662.00 in currency. The affidavit stated that the robber then drove away in a white minivan with a Missouri license plate. The affidavit stated that Highway Patrol Cpl. Kyle Wilmont, who was familiar with the investigative bulletins about previous similar bank robberies, who was stationed at the intersection of Highways 8 and 68, had received descriptions of the robber and his vehicle. The affidavit stated that at approximately 11:29 a.m., he observed a white Dodge minivan being driven by a heavy-set white male wearing a yellow shirt who placed his left hand near his face as he drove past Cpl. Wilmont's patrol car. Because Cpl. Wilmont was familiar with the descriptions of the suspect due to MIAC reports, he conducted a license plate check and pulled over the vehicle. Cpl. Wilmont approached the driver's side of the van. The driver's attention was focused on the center console and he had placed his hands there. The affidavit stated that, when Cpl.

Wilmont contacted the driver, he observed the driver appeared nervous, as his hands were shaking and he was stuttering his words. The driver provided his driver's license identifying him as John Farnell. He exited the van. Cpl. Wilmont told Farnell that the vehicle was similar to that used in a bank robbery that morning in Cuba, Missouri, and asked Farnell for consent to search the vehicle, which Farnell gave. Cpl. Wilmont then asked Farnell if there were any weapons in the vehicle and Farnell said there was a loaded firearm in the center console. The affidavit stated that Cpl. Wilmont located a Ruger .357 revolver in the center console. Upon their arrival, Lt. Remillard ordered Trooper Amy McMahon to place Farnell in handcuffs. Cpl. Wilmont saw a green nylon zipper bag behind the passenger seat. He opened it and saw it contained a large amount of U.S. currency. The search then stopped, and Farnell and the vehicle were transported to Missouri State Highway Patrol Troop I Headquarters in Rolla, Missouri. The affidavit stated that Farnell was advised of his <u>Miranda</u> rights, which he agreed to waive. The affidavit stated that Farnell then confessed to the April 29, 2010, robbery of First Community National Bank of Crawford County, along with five other bank robberies. Farnell stated he wore the same clothing during each robbery: a black baseball hat and a blue long-sleeve buttoned down shirt. Farnell stated that the money found in his vehicle was from the First Community National Bank. (Doc. 80-4; Gov. Ex. D-1.)

21. On April 29, 2010, at 6:10 p.m., based on this affidavit, Judge Adelman issued a search warrant for the white 1996 Dodge Grand Caravan. (Doc. 80-5; Gov. Ex. D-2.)

22. Agent Christian notified officers at the scene that the search warrant had been issued. The officers then executed the warrant and searched the van. From the van Missouri State Highway Patrol officers seized five .357 mm rounds; an identification card holder containing a bank card and $800.00 in cash; maps and written directions; a Nokia cell phone; a green bag containing a black ball cap, a black T-shirt, a blue denim long-sleeve shirt, and $4,562.00; and a flathead screwdriver. (Search Warrant Case No. 4:10 MJ 1053 TIA at 3.)

DISCUSSION

Defendant Farnell has moved to suppress the physical evidence the government has obtained in its investigation. (Doc. 73.) His arguments are based upon the prospect that the court will find that there were several warrantless searches: among them were one immediately following defendant's oral consent to search the van generally and one that occurred after Cpl. Wilmont photographed the gun and the van. He argues that the search made after Wilmont took the photographs was illegal because it was done without a judicial warrant, he did not consent to it, and there were no exigent circumstances to justify it. In response, the government argues that defendant's general consent was sufficient to justify these warrantless searches, because he never withdrew his consent. Further, the government argues that the subsequent federal search warrant was issued upon probable cause. The undersigned concludes that the motion to suppress the physical evidence should be denied.

The Fourth Amendment to the Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. To secure these rights, the Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Id. The goal of the Fourth Amendment is to ensure that a search will be carefully tailored to its justifications, and will not become a wide-ranging exploratory search. Maryland v. Garrison, 480 U.S. 79, 84 (1987).

**Warrantless stop of van**

Cpl. Wilmont's warrantless stop of defendant in his van on April 29, 2010, was lawful. The reasonableness standard of the Fourth Amendment is satisfied to support a brief investigatory stop and the making of reasonable inquiries relevant to the suspicion, when the officer who stops the suspect observes "unusual conduct that leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Minnesota v. Dickerson, 508 U.S. 366, 372-73 (1993); Terry v. Ohio, 392 U.S. 1, 30 (1968). In this case, Cpl. Wilmont was familiar with the MIAC

bulletins that described the robber and his van in the earlier robberies. And he had been given the similar description of that day's robber and van. The man and the van he saw drive past him had characteristics similar to the descriptions of the bank robber and his van. And he saw the driver hold his left hand in a manner to try to shield his face as he drove by the officer. These facts were sufficient to authorize a warrantless investigatory stop. See United States v. Rush, 651 F.3d 871, 876 (8th Cir. 2011)(radio dispatch of recent bank robbery, the shortly-thereafter observation of a vehicle that was easily disposable, and the observation of a large amount of currency in suspect's shoe lawfully supported an investigatory stop); United States v. Spivey, 51 Fed. Appx. 188, 189 (8th Cir. 2002)(reasonable suspicion established by observation of a vehicle with same license places as suspected vehicle and the suspected person matched the general description of the bank robber).

Cpl. Wilmont continued to observe other suspicious facts after he acted to stop the man and van. He observed the driver move suspiciously toward the front seat center console of the van before he stopped the van. After the driver stopped the van and Wilmont directed him to put his hands in view, the officer saw that the man's hands were shaking and that he was extremely nervous. At this time, by his license and the van's registration, the driver was identified as John Farnell. When he directed Farnell to get out of the van, Farnell said he had to get something and moved toward the center console. All of these facts reasonably indicated that Farnell was the armed bank robber then being sought. Wilmont ordered him to stop that movement and to get out of the vehicle.

As the stop lengthened in time and the officer continued to pursue his reasonable suspicion, he heard a radio dispatch that a witness had stated that the robber, among the other distinguishing characteristics, also had a chipped right front tooth. Farnell also heard that dispatch, smiled, and thereby voluntarily displayed that he had a missing left front tooth. While not a chipped right front tooth, the fact that Farnell had such a characteristic only strengthened the officer's reasonable suspicion that he had stopped the robber.

Based upon the his reasonable suspicion, Cpl. Wilmont was authorized to ask Farnell questions reasonably related to the robbery. Terry v. Ohio, 392 U.S. at 30; Minnesota v. Dickerson, 508 U.S. at 372-73. Thus, Wilmont described the known details of the robbery to Farnell. In response, Farnell told Wilmont that he was driving from Steelville after shopping for antiques. However, the officer recollected that he did not see anything in the interior of the van, which he had viewed through the vehicle's window, that looked like antiques. The warrantless investigative stop continued to be lawful because the officer continued to gain inconsistent information from Farnell.

**Warrantless search of maps in the van**

Cpl. Wilmont's searching through the maps on the van's front seat, which he had originally seen in plain view when looking through the van's window, was lawful even though it was warrantless, because Farnell voluntarily consented to the search. The Fourth Amendment's prohibition against unreasonable searches and seizures does not apply where voluntary consent has been given. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990); United States v. Brown, 345 F.3d 574, 579 (8th Cir. 2003). This consent exception to the warrant requirement applies to vehicle searches. Brown, id. Relevant factors for the court to consider include:

> personal characteristics of the defendant, such as age, education, intelligence, sobriety, and experience with the law; and features of the context in which the consent was given, such as the length of detention or questioning, the substance of any discussion between the defendant and police preceding the consent, whether the defendant was free to leave or was subject to restraint, and whether the defendant's contemporaneous reaction to the search was consistent with consent.

Id.

The facts of this case establish that Farnell's consent to the officer searching the maps was voluntary. Farnell was then 58 years of age.[4] He appeared to Cpl. Wilmont to be sober. Finding No. 11. However,

---

[4]See Complaint filed later on April 29, 2010, Case No. 4:10 MJ 1054 TIA, at 2. (Defendant born on November 24, 1951). Fed. R. Evid. 201.

at this time a reasonable person in Farnell's situation would have believed he was not free to leave the scene. This is because Wilmont stopped Farnell's movement toward the center console when he approached the van. The officer gave Farnell no choice but to place his hands in view, to step out of the van, and to move to the rear of the van.[5]

Nevertheless, Farnell's consent remained voluntary. The facts known to Farnell at the time of his oral consent included the fact that he was being investigated as a suspect in a bank robbery and that he himself had shielded his face as he drove past the officer. When he told the officer he could look through the maps inside the van on the front passenger's seat, Farnell had not been subjected to any coercive threat or promise. The consent was given within a short time after the officer stopped him. His ability to not consent had not been restricted. Cpl. Wilmont followed the consent by looking through the maps and papers on the passenger's seat. After he looked through the maps, he asked Farnell questions about them.

**Warrantless general search of the van**

Thereafter, Farnell gave his oral consent to a general search of the van and its contents. Again, when Cpl. Wilmont asked if he would consent, Farnell reasonably understood that he was a suspect in the bank robbery under investigation. Cpl. Wilmont had told him that he was investigating this suspicion and that FBI agents were on their way to the scene also to investigate him as a suspect. A reasonable person in Farnell's circumstances would believe he was not free to leave the scene. Yet, he continued to cooperate in the investigation. This is amply demonstrated by his voluntarily disclosing with a smile that he had a tooth missing after he overheard the police radio dispatcher tell Cpl. Wilmont that a robbery witness had said the robber had a chipped left

---

[5]Cpl. Wilmont acted lawfully and reasonably in doing this, because the robber was reasonably believed to be armed and because Farnell had made a suspicious move to the center console where a firearm could have been and in fact had been concealed. See Terry v. Ohio, 392 U.S. at 23-24 (an officer, albeit without probable cause to arrest, may take necessary measures to determine whether suspect is armed and to "neutralize the threat of physical harm").

front tooth.  Wilmont had told Farnell what the relevant evidence was and then asked for his consent to search the van and its contents, which Farnell orally gave.  Again, no threats or promises were made to induce Farnell to consent.

Farnell never withdrew his consent for the officer to search, even knowing it would be a general search of the van and of its contents.  He continued to consent voluntarily, because when the officer asked Farnell whether any items he had previously described to him were in the van, Farnell voluntarily told him that a gun was in the center console.  Immediately thereafter, Wilmont entered the van and seized and secured the gun.  Any belief Farnell had that the officer would eventually find evidence against him does not demean, but buttresses, the legal sufficiency of his general consent to search.  United States v. Hathcock, 103 F.3d 715, 720 (8th Cir. 1997); United States v. Todhunter, 297 F.3d 886, 891 (9th Cir. 2002).

Farnell argues that Cpl. Wilmont stopped the search of the van, when he was directed to photograph the seized gun and the van by Lt. Remillard.  In fact, in response to this order, Cpl. Wilmont stopped what he was doing, left the van, and photographed it and the firearm.  Farnell now argues that the officer then returned to the van and unlawfully engaged in *another, separate* warrantless search of the remainder of the van without his consent.  The undersigned disagrees.

The scope of a search based upon a person's consent is limited to the scope of the consent.  United States v. Siwek, 453 F.3d 1079, 1084-85 (8th Cir. 2006).  It is clear that Farnell knew he had consented to the officer searching the entirety of the van including its contents.  When Wilmont stopped to follow his superior's order to photograph the gun and the van, Wilmont had not finished the search of the van and its contents that Farnell had authorized.  When he returned to continue searching, Farnell did not object.  Thus, a reasonable officer in Wilmont's position would believe he was authorized by the general nature of Farnell's earlier consent to complete the full, general search of the van and of its contents, before and after stopping to take the photographs as directed.  Whether the officer's search activity is considered one search

or separate searches, continuing with the search activity was consistent with and supported by Farnell's earlier voluntary consent.

**Warrantless search of the green nylon bag**

Farnell argues that his oral consent to search did not extend to the closed green bag inside the van. The court disagrees. In <u>Florida v. Jimeno</u>, 500 U.S. 248 (1991), the defendant gave the police oral permission to search his vehicle. In this search, an officer opened the passenger door, saw a brown paper bag on the floorboard, picked it up, opened it, and found a kilogram of cocaine inside. <u>Id.</u> at 249-50. In suppressing the drug contraband, the Florida state courts stated a *per se* rule that consent for a general search did not extend to sealed containers. <u>Id.</u> at 250. The United States Supreme Court disagreed and stated the following criteria:

> The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect? The question before us, then, is whether it is reasonable for an officer to consider a suspect's general consent to a search of his car to include consent to examine a paper bag lying on the floor of the car. We think that it is.
>
> The scope of a search is generally defined by its expressed object. In this case, the terms of the search's authorization were simple. Respondent granted Officer Trujillo permission to search his car, and did not place any explicit limitation on the scope of the search. Trujillo had informed respondent that he believed respondent was carrying narcotics and that he would be looking for narcotics in the car. We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container. Contraband goods rarely are strewn across the trunk or floor of a car. The authorization to search in this case, therefore, extended beyond the surfaces of the car's interior to the paper bag lying on the car's floor.

<u>Id.</u> at 251 (internal citations omitted); <u>see also</u> <u>Siwek</u>, 453 F.3d at 1085 (a general statement of consent to search a truck made it objectively

reasonable for the officer to search for the items, previously disclosed to defendant as the objects of the officer's interest, in any part of the truck where these items might be stored).

In this case, Wilmont had told Farnell that he was looking for a blue button-down shirt, a ball cap, a large amount of money, and a weapon. Wilmont also knew Farnell knew the purpose of the stop and the investigation. Further and of great importance, Wilmont had asked for consent to search the van *and its contents*. A reasonable person in Wilmont's position would believe he was authorized by Farnell's general consent to search the van and the interior of containers found in the van, which he did without Farnell objecting.

**Search warrant for the white van**

At 6:10 p.m. on April 29, 2010, Magistrate Judge Terry I. Adelman issued a search warrant for the white van. Thereafter, various evidentiary items were seized from the van. These items should not be suppressed.

The issue before this court when reviewing the validity of the issuance of a search warrant by another judge is whether the supporting materials gave the issuing judge a substantial basis for concluding that probable cause existed for the issuance of the warrant. United States v. Butler, 594 F.2d 955, 962 (8th Cir. 2010); United States v. Martin, 866 F.2d 972, 976 (8th Cir. 1989) (citing Illinois v. Gates, 462 U.S. 213, 238-39 (1983)). Probable cause means a "fair probability that . . . evidence of a crime will be found in a particular place," given the circumstances set forth in the affidavit. United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999) (quoting Illinois v. Gates, 462 U.S. at 238).

The affidavit in this case provided Judge Adelman a substantial basis for finding probable cause for issuing the search warrant. The affidavit described the events of earlier that day: the bank robbery in Cuba; the taking of a large amount of money; the robber's description; the getaway vehicle's description; Cpl. Wilmont's observation of a van and driver meeting these descriptions a short time later; the vehicle stop; the driver's positioning of his hands near the center console; the

driver appearing to be nervous with his hands shaking; the driver's statements to the officer; the consent search of the vehicle; the seizure of the firearm from the center console; the discovery of a large amount of currency in a closed green nylon bag in the van; the driver's later confession that he had robbed the bank earlier in the day with the gun found in the center console; and the driver's confession that he had robbed five banks prior to his arrest, all while wearing the same clothing. (Gov. Ex. D-2.)

For these reasons,

**IT IS HEREBY ORDERED** that the motion of defendant John D. Farnell to disclose favorable, impeaching, and/or exculpatory information (Doc. 70) is denied as moot.

**IT IS FURTHER ORDERED** that the motion of defendant John D. Farnell to produce internal memoranda and produce rough notes (Doc. 71) is denied as moot.

**IT IS HEREBY RECOMMENDED** that the motion of defendant John D. Farnell to suppress physical evidence (Doc. 73) be denied on its merits.

**IT IS FURTHER RECOMMENDED** that the motion of defendant John D. Farnell to suppress statements (Doc. 74) be denied as moot.

The parties are advised that they have 14 days, until November 22, 2011, to file written objections to this Order and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on November 8, 2011.